[Civil No. 3415.  Filed October 30, 1933.]

[26 Pac. (2d) 113.]

OCEAN ACCIDENT & GUARANTEE CORPORATION, LIMITED, Insurance Carrier, Petitioner, v. CHARLES D. KENNISON, Compensation Applicant, THE INDUSTRIAL COMMISSION OF ARIZONA, Respondents.

Mr. C. H. Young (Mr. Paul J. Feehan, of Counsel), for Petitioner.

Mr. Don C. Babbitt and Mr. D. L. Cunningham, for Respondent Commission.

ROSS, C. J.—Charles D. Kennison was awarded compensation for accidental injuries sustained while working for the General Motors Acceptance Corporation, hereinafter referred to as the corporation. The Industrial Commission found he was an employee and that his injury arose out of and in the course of his employment. The Ocean Accident & Guarantee Corporation, Limited, insurance carrier, moved for a rehearing on the ground that the evidence conclusively showed that Kennison was an independent contractor and not an employee of the corporation at the time of his injury. Upon the rehearing the award was affirmed. The record is before us upon a writ of *certiorari* issued at the instance of the insurance carrier.

The evidence bearing upon the character of Kennison's employment consists of the testimony of Kennison and G. A. Brelin, Phoenix manager of the corporation, at the original hearing and at the rehearing; and, while in detail there are some discrepancies, in the main and in its legal effect their testimony at both hearings is the same. Brelin was not antagonistic to Kennison's claim for compensation, but rather friendly, we think, because he announced at the first hearing that the corporation was not appearing to defend against the claim, but "just here to take a record of what transpired."

The insurance carrier was represented at the first hearing by its local agent, Jack Barr.

Kennison appeared for himself.

The referee stated before any testimony was taken, and repeated it several times during the taking of testimony, that the issue was whether Kennison was an independent contractor or an employee at the time of his injury.

The character of the corporation's business was such that frequent occasions arose when it was necessary for it to repossess from purchasers, or their assigns, automobiles that had been sold on conditional contracts. Trips for this purpose into many parts of the country, near and far and extending over a period of some two years, had been made for the corporation by Kennison. He was not included in the corporation's liability insurance and was not carried on its regular pay-roll as an employee, but made and entered into a separate contract or engagement for each trip he took for the corporation.

He says that when the corporation informed him where a repossessed automobile was he would figure up the expenses of the trip both ways and add thereto $4 per day for the estimated time required to make the trip, and submit the statement to the corporation, which would give to him a check for the amount; that he would then go and get the car and on his return render a statement of the expenses of his trip to the corporation, and, if the expenses and his per diem of $4 were less than the amount advanced, he would return to the corporation the balance, but if the expenses and the per diem were more than the sum advanced, the corporation would pay him such additional sum as necessary to make his per diem $4. This kind of arrangement, we understand, was the one under which most of his trips were made for the corporation.

The trip in which he was hurt was one to Kansas City and return. Concerning the arrangement to make this trip he testified as follows:

"Q. Now on this particular trip what was the arrangement? A. That was for a flat rate—$75.00 for the trip.

"Q. $75.00 for the trip and out of that you were presumed to make payment of all costs? A. Yes.

"Q. Including your own wage? A. Yes, sir. . . .

"Q. In cases where you made a flat price for the expenses and remuneration involved, would you make out one of these things—one of these receipts? A. Yes, they had to have one made out for their records, or for the expenditure of that money and there has been one or two cases where I made a trip of that kind and came out on the wrong end of it that when I filed my voucher like that, a correction was made in the office so I wouldn't lose anything on the trip.

"Q. If you ran into bad luck they would make it up to you? A. Yes sir. I want to state that there is not any—I am not a contractor—I wasn't working as an independent contractor in returning these cars . . .

"Q. In this particular trip you got an advance of an additional $75.00, is that correct? . . . A. Yes sir. I had to wire in for money from Lincolnville."

In response to the question by the referee, "Then you do consider that you were an independent contractor on this trip?" he answered:

"I do on this one, yes. That was my intention when I started out, but the company I think realized the position I was in and I think they made it possible for me to make the trip at the actual cost rather than at the contract price. They didn't hold me to the contract price."

After the accident Kennison wired the corporation stating his trouble and asked for $75 more, which was sent him. He testified that, instead of submitting to the corporation a voucher for the contract price of $75, after the accident he itemized his expenses and the corporation waived or "considered . . . the flat rate was off," and he put in the actual expenses of his trip. He used the last $75 to pay repairs of the car, to pay doctor's bills and his other expenses in

connection with the accident. Asked if all of this $75 was consumed, he said:

"No, there was some left over which I believe I still owe to the company. I have never returned that. I have never been in a financial condition since that time to return that money to them. What I proposed to do, if I had been financially in a position to do it, would have been to have kept my agreement of $75.00 and any cost over the $75.00 I would have assumed it myself which I have not been able to do. I want to be perfectly frank with you."

Brelin, describing the arrangements made with Kennison to return repossessed cars, used this language:

"We would send him out on a particular job. We would advance enough money to take care of it—we considered to be his expenses, making allowance for meals, rooms, etc., depending on the number of days we figured it would take him to make the job and get back to Phoenix. This particular instance here I believe we advanced $75.00 to Mr. Kennison on the 12th of October. If he had not had this wreck why of course it would not have been necessary to require the additional $75.00, but in view of the wreck we had to advance more money. We figured Mr. Kennison should average around 10 or 12 days to make the job —get the car and bring it back."

He testified the amount advanced for a trip was calculated on the basis of the actual costs of the trip and $4 per day remuneration to Kennison. This witness was asked and he answered as follows:

"Q. And no accounting on such advance in this case or any other case would have ordinarily been figured? A. That is correct.

"Q. In this particular case you say you had to make an additional $75.00 advance? A. Yes.

"Q. What basis was that advance made on? A. Well, it was necessary primarily due to the fact that the car was damaged in this wreck, Mr. Kennison had

to have additional funds on hand to get it fixed so he could come on to Phoenix."

He stated that Kennison exercised his own discretion as to the route on return trip as also going, or as to whether he would travel at night or not; that he was expected to travel at a reasonable rate of speed and not to carry any guests; that out of advances made he was to defray the ordinary expenses of the trip, but the corporation put up additional funds for major difficulties such as the repair of the auto in this case after the accident, for ruined tires, tubes, etc.

Kennison, when asked to what extent the corporation directed him in the manner of doing his work, answered:

"Well, only go and get the car and bring it in. They had confidence in me, or they wouldn't send me, that I would execute the journey in a manner that was acceptable to them."

At the rehearing Kennison testified that the arrangement was that he would receive all his expenses and $4 per day for the trip to Kansas City and return; that the $75 advanced to him before going for the car was the sum estimated by him as necessary to pay such expenses and allow him $4 per day; that, if it had turned out that the advance was too little for those purposes, the corporation would make it good, or, if too much, he would account for the excess to the corporation. He testified he did not agree to go to Kansas City and return the car for the "flat rate of $75.00"; that in his former testimony he "misunderstood . . . didn't realize what the question was"; that the $75 did not include wages; that "there has been no time I ever entered into a contract for the company to move a car"; that he had "been employed at so much a day and that was recognized in all cases."

When asked if his testimony on the first hearing was correct, he answered:

"It was correct and it was not correct. I was confused in the questions that were asked me."

At the rehearing, Brelin, when asked what the original arrangement was, said:

"It was this: We advanced a sufficient amount of expense money to him that we thought would enable him to get back and have enough left over to give him a reasonable margin of remuneration for his time. That is the way we always worked it. Sometimes he got an average of $4.00 a day. That is the way we tried to figure it. If he lost money, we would reimburse him for the loss. Our object in handling it on a temporary basis with a temporary employee was to give him enough to remunerate him for his time.

"Q. At what rate? A. We tried to figure it at $4.00 a day, but had no set schedule and there is nothing in our records to show he was a temporary employee at $4.00 a day. If he had a contract, I would not give him $75.00, nor would I have sent him another $75.00 two days after the wreck."

This witness' testimony is somewhat weakened by his admission that he never talked with Kennison about the trip, and that his "assistant took care of the job."

We deduce from this evidence that the arrangement between Kennison and the corporation was that he go to Kansas City and get the automobile either at the flat rate of $75, or for the expenses of the trip and remuneration at the rate of $4 per day. The testimony at the original hearing rather conclusively shows that the agreement was that Kennison would go for and return the automobile, bearing all the expense himself, for $75. That is what he says, and it is also in effect what the corporation's local manager says. Under such an agreement every dollar he saved on expenses was added to his compensation, which might or might not exceed $4 per day. In this

respect he took the chances. We judge from his testimony that he is a man of experience and fair intelligence, and that he understood what he was saying, and its full meaning, when he testified:

"What I proposed to do, if I had been financially in a position to do it, would have been to have kept my agreement of $75.00 and any cost over the $75.00 I would have assumed it myself which I have not been able to do. I want to be perfectly frank with you."

His testimony and that of Brelin at the rehearing make the terms of the agreement somewhat different, but, if the last version be accepted as true, it does not change, as we conceive it, the relation they sustained to each other. Under the later version, Kennison, instead of doing the job for $75 flat and standing all the expenses, was to receive expenses and remuneration at the rate of $4 per day. In both cases his obligation was the same. He was under the same supervision and control, or lack of supervision and control. The whole job was entrusted to him. He was his own master in its performance. As is said in one case, "his contract was not to serve a master, but to serve an object." *Clark's Case,* 124 Me. 47, 126 Atl. 18. From the time he commenced to perform his agreement, by leaving Phoenix for the place where the automobile was located, until he returned to Phoenix, there was no one in behalf of the corporation to direct, supervise, or control his movements. As he says, the corporation "had confidence . . . that I would execute the journey in a manner . . . acceptable to them."

The question under this evidence is, Was Kennison in executing the journey an independent contractor or an employee of the corporation? The compensation law (section 1418, Revised Code of 1928) defines an independent contractor as follows:

"A person engaged in work for another, and who while so engaged, is independent of the employer in

the execution of the work, not subject to the rule or control of the person for whom the work is done, but engaged only in the performance of a definite job or piece of work, and subordinate to the employer only in effecting a result in accordance with the employer's design, is an independent contractor and an employer within the meaning hereof.''

This is a restatement of the common law and of the rule announced by this court in *Swansea Lease, Inc.,* v. *Molloy,* 20 Ariz. 531, 183 Pac. 740. The facts clearly bring the case within the definition of an ''independent contractor.'' Here was a definite job or piece of work that the corporation desired to have done, the doer in its performance being subordinate to the corporation's supervision and control only in effecting the result in accordance with its design.

Nor do we think Kennison was a pieceworker rather than an independent contractor. If he was to receive for the job $75 flat and pay therefrom expenses, if such was the contract, the corporation could not discharge him as it could one working by the day. Neither party could rescind or abandon the contract without incurring a liability in damages to the other. If the contract was that Kennison would go for the car and bring it to the corporation for his expenses and $4 per day, and he was paid in advance on his estimate enough to cover these items, the corporation could not rescind and sue Kennison to recover advances, nor could Kennison refuse to perform his contract without liability to the corporation. As we understand it, a pieceworker is one who has no contract to do any certain amount of work or to work any given number of days, or one who may be discharged at any time for any reason without breaching the contract. *Grabe* v. *Industrial Commission,* 38 Ariz. 322, 299 Pac. 1031; *Arizona-Hercules Copper Co.* v. *Crenshaw,* 21 Ariz. 15, 184 Pac. 996; *McKinstry* v. *Guy Coal Co.,* 116 Kan. 192, 225 Pac. 743, 38 A. L. R. 837, and note at page 839.

The manner Kennison was to be paid, whether a lump sum for the job or expenses and $4 per day, would not make any difference in the relation between him and the corporation, since in both cases it was for a completed definite job, the fulfillment of which neither could legally deny the other. *Clark's Case, supra.*

If the employer exercises the right of supervision and control, not simply of the result of the work, but the methods and manner by which the result is to be attained, or if the employment is what the cases designate as "piecework," then the relation is that of employer and employee. But where the employee in the execution of the work is not subject to the rule or control of the person for whom the work is done, except in accomplishing a certain result, he is an independent contractor. *Fox West Coast Theatres* v. *Industrial Commission,* 39 Ariz. 442, 7 Pac. (2d) 582; *S. H. Kress & Co.* v. *Industrial Commission,* 38 Ariz. 330, 299 Pac. 1034.

We think the evidence showed affirmatively and conclusively that, at the time Kennison was injured, he was an independent contractor and not an employee of the corporation. Such being the case, the award of the commission is set aside.

LOCKWOOD and McALISTER, JJ., concur.